# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CRIMINAL ACTION**<br>**No. 07-230** |
| **MICHAEL DIMATTEO,**<br> **Defendant.** | |

## MEMORANDUM  AND  ORDER

**Katz, S.J.**                                                              **January 17, 2008**


Before the court are the "Government's Motion to Admit Tape Recordings" (Document No. 3); the "Reply of Defendant Michael DiMatteo to Government's Motion to Admit Recordings and Transcripts, and Motion to Suppress" (Document No. 20); Defendant's "Memorandum in Support of Defendant DiMatteo's Reply to Government's Motion to Admit Recorded Conversation and Transcripts, and Defendant's Motion to Suppress" (Document No. 45); and the Government's response thereto (Document No. 46).  For the following reasons, the Government's motion is granted and Defendant's  motion is denied.


## I.      Background

Defendant Michael DiMatteo ("Defendant") is charged with one count of unlawful transfer of a firearm, namely a silencer; and two counts of possession of

an unregistered firearm, in both cases, a silencer.  During the course of the government's investigation of Defendant, the government tape recorded conversations between Defendant and a cooperating witness, Raymond DiMatteo ("CW").  On May 10, 2007, the Government filed a motion to admit these tape recordings, and to distribute transcripts of the same to the jury while the tape recordings are being played aloud.

On December 3, 2007, Defendant filed a response objecting to the admission of the tape recordings and transcripts, as well as a motion to suppress the same.  Defendant objected to the authenticity and correctness of the recordings, the non-alteration of the recordings, the proper preservation of the recordings, the proper identification of the speakers on the recordings, and the accuracy of the transcripts.  Defendant also objected to the lack of evidence that the conversations elicited were made voluntarily and in good faith, without any kind of inducement.  Defendant also objected that the tape recordings were inadmissible hearsay, and  in violation of Defendant's Sixth Amendment confrontation rights.[1]

---

[1]   The Sixth Amendment to the Constitution of the United States of America provides that "In all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him."  U.S. CONST. amend. VI, § 2.

2

Given Defendant's objections, this court held a *Starks* hearing on December 12, 2007.  On January 3, 2008, following the hearing, Defendant filed a memorandum in support of his reply to the Government's motion and his own motion to suppress the tape recordings.  Defendant renewed his objections to the authenticity and correctness of the recordings, the non-alteration of the recordings, as well as the lack of evidence that the conversations elicited were made voluntarily and in good faith, without any kind of inducement.  Defendant also raised concerns regarding chain of custody, and the quality of the audio recordings.  The Government filed its response on January 16, 2008.

## II.    The *Starks* Hearing

At the *Starks* hearing, the Government first called Gina DiMatteo ("Mrs. DiMatteo"), wife of the CW, Raymond DiMatteo.  (Tr. 3, 5.)  Mrs. DiMatteo first adopted witnesses statements previously submitted to this court.[2]  (Tr. 3-4.)  Next, she confirmed her husband's death on May 20, 2007.  (Tr. 6.)  Mrs. DiMatteo then testified that she was familiar with the voices of both Defendant and the CW.  (Tr.

---

[2] *See* Government's Witness Statements, Proposed Findings of Fact and Conclusions of Law in Support of Government's Motion to Admit Tape Recordings, Document No. 28 at *3-4 (E.D.Pa. December 4, 2007); Government's Witness Statements, Proposed Findings of Fact and Conclusions of Law in Support of Government's Opposition to Defendant's Motion to Suppress, Document No. 33 at *3-4 (E.D.Pa. December 5, 2007).

6-7.)  She also testified that after listening to the tape recordings, she was able to identify the voices of Defendant and the CW on those recordings (Tr. 8, 11.) Finally, Mrs. DiMatteo testified that the transcripts accurately reflected the tape recordings, and correctly identified the speakers.  (Tr. 10, 13.)

On cross-examination, Mrs. DiMatteo admitted that she had not seen nor spoken to Defendant in at least ten years.  (Tr. 15.)  She also testified that she could hear ninety percent of everything on the tapes.  (Tr. 16.)  Mrs. DiMatteo testified that she had listened to the entire tapes and read the entire transcripts herself.  (Tr. 18.)

The Government next called ATF Special Agent Patrick Edwards ("Agent Edwards") to testify.  Agent Edwards also adopted witness statements previously submitted to this court.[3]  (Tr. 20-1.)  Agent Edwards testified that he was the case agent and that he personally made first contact with the CW on November 2, 2006, in response to information from the South Detective Division in Philadelphia that "there was someone there that wanted to give information with regard to an individual in possession of silencers and machine guns."  (Tr. 21-2.)  Agent

---

[3]*See* Government's Witness Statements, Proposed Findings of Fact and Conclusions of Law in Support of Government's Motion to Admit Tape Recordings, Document No. 28 at *1-3 (E.D.Pa. December 4, 2007); Government's Witness Statements, Proposed Findings of Fact and Conclusions of Law in Support of Government's Opposition to Defendant's Motion to Suppress, Document No. 33 at *1-3 (E.D.Pa. December 5, 2007).

Edwards testified that the CW informed him that Defendant was manufacturing silencers and had approached the CW about staging a burglary of approximately $200,000.00 worth of firearms.  (Tr. 22-3.)  Agent Edwards also testified that during that first meeting, the CW "explained that he had outstanding arrests and he was hoping that by giving information and cooperating with us that we would mention it to the local court." (Tr. 24.)

Agent Edwards testified that on both January 18 and January 22, 2007, the CW agreed to wear recording and transmitting equipment, and freely and voluntarily consented to the recording and transmission of his conversation with Defendant.  (Tr. 26, 40.)  Agent Edwards also testified that the CW was eventually paid $300.00 for his assistance.  (Tr. 50.)  According to Agent Edwards, although the CW initially "wanted to give information to work off the cases as he put it...those cases were being resolved on their own so...he asked if he could be paid for his cooperation."  (Tr. 50.)

Agent Edwards testified that he had previous training in the equipment used to record the conversations on January 18 and January 22, 2007 (Tr. 26-7), that he had previously used that same equipment successfully (Tr. 27), and that the same equipment was used on both dates (Tr. 40).  Agent Edwards testified that he was the one who placed the equipment on the person of the CW, and turned it on and

off.  (Tr. 27-8, 32, 40-1, 45).  Agent Edwards also testified that he listened to both conversations in their entirety as they were being transmitted, and that those conversations match those on the recordings.  (Tr. 29-31, 35-6, 42, 44, 47.) Notably, Agent Edwards testified that on January 22, 2007, he personally saw Defendant conversing with the CW, while listening to the conversation.  (Tr. 43.)

Agent Edwards testified that he personally logged the original tape recording inside the evidence vault at ATF headquarters in Philadelphia where it remains (Tr. 32-3, 45-6), made the original copies onto CD (Tr. 33, 46), and used the CD to make tapes for purposes of playback in court (Tr. 33, 46-7).  According to Agent Edwards, this procedure was entirely in keeping with ATF procedures. (Tr. 34.)  Agent Edwards also testified that original evidence is always maintained inside the vault, and in order to avoid risking the integrity of the originals, copies are used for other investigative purposes, including review and presentation in court.  (Tr. 46.)

According to Agent Edwards, the voices on the tape recording are those of the CW, of Defendant and of himself.  (Tr. 34-5, 47.)  Agent Edwards testified that he was familiar with Defendant's voice after interviewing him during the execution of the federal search warrant on January 29, 2007.  (Tr. 35.)  Finally, Agent Edwards testified that the transcripts were accurate (Tr. 38, 48), that the

voices in the tape recordings were accurately identified in the transcripts (Tr. 39, 48-9), and that the transcripts accurately reflect the conversations Agent Edwards heard as they occurred (Tr. 39, 48).

On cross-examination, Agent Edwards testified that an original CD had been made directly from the recording device, and had stayed in the ATF evidence vault at all times, except when used to make copies.  (Tr. 54-5, 98.)  According to Agent Edwards, he made two copies from the CD, one for the Government and one for the defense.  (Tr. 55, 98.)

With regards to the transcription process, Agent Edwards admitted that he was not present at all times while the tapes were being transcribed, and with the exception of the transcriber, he did not know who had access to the tapes while they were being transcribed.  (Tr. 56.)  Agent Edwards also testified that the transcripts were prepared after the CW had died (Tr. 100), and that the CW never heard the tapes nor read the transcripts (Tr. 59).  However, Agent Edwards testified that he had personally reviewed the transcripts (Tr. 56-7), and had clarified some things the transcriber had not understood (Tr. 57, 100-1).  With the exception of their use for transcription, Agent Edwards testified that the copies of the tape recording were maintained in a locked cabinet to which only he had access.  (Tr. 59.)

7

With regards to the CW, Agent Edwards testified that the CW had a long criminal record (Tr. 70), dealt in prescription narcotics (Tr. 70-1), gave prescription pills to Defendant on January 18, 2007 (Tr. 75), and that the CW's cause of death may have been an overdose (Tr. 91).  Agent Edwards also testified that the CW had slurred speech due to an earlier accident (Tr. 70), and was a prior informant (Tr. 71-2).  However, Agent Edwards also testified that he never appeared in court on the CW's behalf nor wrote any letters for him on any of his cases, except for talking to the prosecutor when the CW was arrested in connection with another investigation.  (Tr. 93.)  Agent Edwards testified that the CW's conversation with Defendant were not scripted (Tr. 80, 82-3, 86), and that the CW was paid simply for "going in and coming out."  (Tr. 90.)

Agent Edwards admitted that the tape recordings have "quite a few inaudibles."  (Tr. 58.)  However, on redirect, Agent Edwards testified that the majority of the tape recordings are audible, and that in the majority of the inaudible sections only one to two words could not be heard.  (Tr. 103.)

## III.   Discussion

### A.     Admissibility of the Tape Recordings

Defendant objects to the admission of the tape recordings in this case on four grounds: (1) the Government cannot lay a proper foundation, as it cannot satisfy the *Starks* test; (2) hearsay; (3) Defendant's Sixth Amendment confrontation rights; and (4) audibility of the tapes.

1.    The *Starks* Test

With regards to the admission of tape recordings into evidence, the Third Circuit has expressed special concerns that "Tape recordings are not readily identifiable as the original version.  They are peculiarly susceptible of alteration, tampering and selective editing."    *United States v. Starks*, 515 F.2d 112, 121 (3d Cir. 1975).  As a result, the Third Circuit held that "the burden is on the government 'to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings.'"  *Id.* at 121 (*quoting United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967)).

In that same opinion, the Third Circuit cited with approval the conclusion that "before a sound recording is admitted into evidence, a foundation must be established by showing the following facts: (1) That the recording device was capable of taking the conversation now offered in evidence.  (2)  That the operator of the device was competent to operate the device.  (3) That the recording is authentic and correct.  (4) That changes, additions or deletions have not been made

9

in the recording.  (5)  That the recording had been preserved in a manner that is
shown to the court.  (6)  That the speakers are identified.  (7)  That the
conversation elicited was made voluntarily and in good faith, without any kind of
inducement."  *Id.* at 121, fn. 11 (*quoting United States v. McKeever*, 169 F.Supp.
426, 430 (S.D.N.Y. 1958)[4]).

Defendant did not object to elements one or two of the *Starks* test, and given
the testimony presented by the Government, this court finds that the Government
has met its burden with regards to these elements.  In his most recent filing,
Defendant challenges the Government's ability to meet elements three, four and
seven of the *Starks* test.  (Def.'s Mem., Document No. 45, at *7.)  However,
Defendant did not renew his objections to elements five and six of the *Starks* test.
Nevertheless, this court will still find that the Government established both of
these elements by clear and convincing evidence.[5]

---

[4]This court notes that the Second Circuit has rejected the inflexible approach of
*McKeever*, choosing instead to regard the factors listed in that opinion as a "valuable
formulation...a trial judge should consider in making an initial determination whether a sufficient
foundation for the admissibility of the tape recordings has been established.  *United States v.
Fuentes*, 563 F.2d 527, 532 (2nd Cir. 1977).  The Second Circuit went on to expressly reject
adopting an "inflexible criteria applicable to all cases."  *Id.*

[5]With regards to the sixth factor of the *Starks* test, this court agrees with Judge Shapiro's
holding in *United States v. Tubbs*, that "The government need only produce evidence sufficient to
convince a reasonable jury by a preponderance of the evidence that defendant is the speaker in
order to permit a jury to hear the tape recording."  1990 WL 27365, at *3 (E.D.Pa.); *see infra*, fn.
8.  As this is a less stringent standard than the one under the *Starks* test, the Government would

```
                                                                (continued...)
```

With regards to elements three and four, Defendant seems to conflate the admissibility of the tape recordings with that of the transcripts.[6]  With respect the tape recordings, Defendant's actual objections seem to be (1) the making and use of duplicates, and (2) chain of custody.

In this case, the original CD copy made from the recording device was placed in the ATF evidence vault, and only taken out to make additional copies. (Tr. 54-5, 98.)  Agent Edwards then made two tape copies, one for the Government and one for the defense. (Tr. 55, 98.)  A tape copy was used to transcribe the tapes, and was intended to be played at trial.  (Tr. 52, 56.) According to the Federal Rules of Evidence, a duplicate is a "counterpart produced...by mechanical or electronic re-recording."  FED. R. EVID. 1001(4). Moreover, a duplicate  "is admissible to the same extent as an original, unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

---

[5](...continued)
clearly meet this burden as well.
    Moreover, this court feels that determining the identity of the speakers is a factual issue that should be left for the jury to decide.  *Id.*  Thus, even though this court finds enough evidence to support admitting the tape recordings, this does not foreclose the possibility that the identity of the speakers on the tape recordings may also be raised at trial.

[6]Both the timing and the accuracy of the tape recordings' transcription are irrelevant to the admissibility of the tape recordings themselves.  (*See* Def.'s Mem., Document No. 45, at *4-6.)

11

FED. R. EVID. 1003.  Here, Defendant has failed to raise a genuine question as to the authenticity of the original, and this court finds no reason why it would be unfair to admit the duplicate in lieu of the original.  Therefore, this court finds Defendant's first argument unconvincing.

With regard to chain of custody, Defendant emphasizes that although Agent Edwards personally took a copy of the tape recordings to be transcribed, he was not present while they were transcribed, and does not know who had access to them during the several days they were being transcribed.  (Def.'s Mem., Document No. 45, at *4.)  Thus, Defendant implies that such constitutes a fatal missing link in the chain of custody.

To establish a proper chain of custody, the Government must establish that the evidence is in substantially the same condition as when it was originally seized.  *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981); *United States v. Clark*, 425 F.2d 827, 833 (3d Cir. 1970).  The trial judge can find a proper chain of custody and admit evidence if "there is a reasonable probability that the evidence has not been altered in any material respect."  *Jackson*, 649 F.2d at 973.  To show a lack of material alteration, the Government only needs to show it took reasonable steps to prevent tampering; it need not exclude all possibilities of tampering.  *United States v. Santiago*, 534 F.2d 768 (7th Cir. 1976).

12

Here, this court finds that the Government did take reasonable steps to prevent tampering. Moreover, this court notes that the alleged flaw in the chain of custody would not affect either the original or the taped copies not used in the transcription process. However, Defendant does not contend that the original or either of the taped copies differ in any way. *See United States v. Lanzar*, 69 Fed. Appx. 224, 229 (6th Cir. 2003) (upholding the admission of tape recordings where "the defense has failed to point to any portions of the tapes that it contends were inaccurate or were the result of tampering.") Thus, while there is a possibility that the tapes were tampered with while in the custody of the transcriber, this court finds it far more likely that the tapes are in substantially the same condition as when they were originally seized. As a result, this court finds that a proper chain of custody was established.

Given the unpersuasiveness of Defendant's objections and the testimony of Agent Edwards, this court finds that the Government established by clear and convincing evidence both elements three and four of the *Starks* test.

Finally, the seventh factor of the *Starks* test has been interpreted by the Third Circuit from the standpoint of protecting constitutional or statutory rights to

privacy,[7] noting that "it does not violate an individual's constitutional or statutory privacy interests to introduce at a criminal trial tape recordings of his private conversations if the other party to those conversations voluntarily consented to their recording." *United States v. Kelly*, 708 F.2d 121, 125 (3d Cir. 1983). Determining whether a person's consent to the recording of a telephone conversation is voluntary must be based upon "the totality of the circumstances." *Id.* (internal citations omitted).  Consent is not voluntary if "it is coerced, either by explicit or implicit means or by implied threat or covert force." *Id.*  Instead, "consent will be considered voluntary if, from the totality of the circumstances, the trial court determines that the party agreeing to a wiretap did so consciously, freely, and independently and not as the result of a coercive overbearing of his will." *Id.*

Here, Defendant argues that the Government cannot establish that the CW freely and voluntarily consented, without any improper inducement, to the tape recording of the January 18 and January 22, 2007 conversations, because the CW is dead.  However, this argument is without merit.  *See United States v. Johnson*,

---

[7]This court notes that other circuits have interpreted the seventh factor of the *Starks* test differently.  *See e.g.*, *United States v. Brown*, 604 F.2d 557, 560 (8th Cir. 1979) (holding that the seventh factor "required only that the Defendant's statements, as elicited by the witness, be made voluntarily, in good faith and without any inducement.").

2005 WL 488372 (D.Del.) (finding voluntary consent based on the testimony of the DEA case agent, and without the testimony of the confidential informant); *United States v. Perez*, 1996 WL 4080 (E.D.Pa.) (finding voluntary consent based on the testimony of an FBI agent, and without the testimony of the cooperating witness who wore the body wire). Moreover, Agent Edwards clearly testified that the CW freely and voluntarily consented to the tape recording. (Tr. 26, 40.) Agent Edwards was the case agent (Tr. 21), and the only one to meet with the CW, with the exception of a single supervisor (Tr. 96). Thus, Agent Edwards was "well-situated to be informed about the issues surrounding the investigation...[and] would have been aware if the Government had improperly induced the informant." *Johnson*, 2005 WL 488372 at *2.

Defendant argues that since the CW was a corrupted individual, this should somehow weigh against this court finding the CW freely and voluntarily consented to the tape recording. (Def.'s Mem., Document No. 45, at *2.) However, Agent Edwards's testimony makes clear that the CW sought to trade his cooperation first for favorable treatment in his pending criminal cases (Tr. 24, 50), and then for monetary compensation (Tr. 50). Consent "is not necessarily involuntary just because that individual's motives were self-seeking, or because he harbored expectations of personal benefit." *Kelly*, 708 F.2d at 125 (internal

citations omitted).  Moreover, Defendant fails to allege any improper inducement on the part of the Government.  Hence, Defendant's argument is without merit.

As a result, this court finds that the Government has established by clear and convincing evidence the seventh factor of the *Starks* test, and met its burden under *Starks* "to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings."[8]  515 F.2d  at 121.

---

[8]This court notes that it has been the practice among several of the district courts of this circuit to require clear and convincing evidence of each of the seven factors of the *Starks* test. Although this court has followed this practice, it acknowledges that most other circuits view these same factors as "guidelines to be viewed in light of specific circumstances, not a rigid set of tests to be satisfied." *United States v. Oslund*, 453 F.3d 1048, 1054 (8th Cir. 2006); *see also Fuentes*, 563 F.2d at 532; *United States v. Biggins*, 551 F.2d 64, 66-7 (5th Cir. 1977); *United States v. Mouton*, 617 F.2d 1379, 1383 (9th Cir. 1980); *United States v. Smith*, 692 F.2d 693, 698 (10th Cir. 1982 ); *United States v. Clark*, 986 F.2d 65, 68 (4th Cir. 1993); *United States v. Roach*, 28 F.2d 729, 733 (8th Cir. 1994); *United States v. Westmoreland*, 312 F.3d 302, 310 (7th Cir. 2002).  Moreover, the Third Circuit recently held in a non-precedential opinion that failure to meet one of the factors of the *Starks* test is not dispositive.  *United States v. Hodge*, 85 Fed. Appx. 278, 281 (3d Cir. 2003).

With respect to the seventh factor of the *Starks* test, this court also remarks that the Fifth Circuit no longer even includes this factor in its determination of a tape recording's admissibility. *United States v. Stone*, 960 F.2d 426, 436 (5th Cir. 1992); *United States v. Anderton*, 679 F.2d 1199, 1202 (5th Cir. 1982).  Moreover, the Second Circuit uses a less stringent standard, holding that to establish consent, the Government need only "show that the informer went ahead with a call after knowing what the law enforcement officer was about."  *Fuentes*, 563 F.2d at 533.  And as described in footnote 7, *supra*, the Eighth Circuit considers the seventh factor to require "only that the Defendant's statement s, as elicited by the witness, be made voluntarily, in good faith and without any inducement."  *Brown*, 604 F.2d at 560.  Any analysis of the voluntariness of the participating party's consent is conducted separately.  *See United States v. Oslund*, 453 F.3d 1048, 1057-8 (8th Cir. 2006).

While this court recognizes that the Third Circuit has expressly rejected the Second Circuit's position on the seventh factor, *see Kelly*, 708 F.2d at 125, fn. 5, perhaps these different approaches to the seventh factor are in response to this factor's disconnect with the policy

(continued...)

2.     Hearsay

Hearsay is a statement "other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the

---

[8](...continued)
concerns enumerated in *Starks*, 515 F.2d at 121.  Those policy concerns really require that the
"party attempting to admit a tape recording into evidence must prove, by clear and convincing
evidence, that the tape is a true, accurate and authentic recording of the conversation, at a given
time, between the parties involved." *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir. 1984),
*overruled on other grounds by Westmoreland*, 312 F.3d at 310.  Thus, in order to address these
same policy concerns, it would be sensible for the first five factors of the *Starks* test, which relate
directly to the accuracy and authenticity of a recording, to be proven by clear and convincing
evidence.

However, whether an informant voluntarily consents to the taping of a conversation with
the defendant does not reflect whether the recording of that conversation is true, accurate, or
authentic.  Instead, given the Third Circuit's interpretation, it implicates Fourth Amendment
invasion of privacy concerns.  Yet, in countering challenges to consent in the Fourth Amendment
context, the Government need only show consent by a preponderance of the evidence.  *United
States v. Matlock*, 415 U.S. 164, 177 (1974); *United States v. Morales*, 861 F.2d 396, 399 (3d
Cir. 1988).  Thus, rather than have to establish consent by clear and convincing evidence, in
order to have tape recordings admitted into evidence, the Government should only be required to
show consent of the informant or cooperating witness by a preponderance of the evidence.

Similarly, knowing the identity of the parties to a conversation does not impact whether
something is a true, accurate or authentic recording of the actual conversation.  Thus, in order for
a tape recording to be admitted, as Judge Shapiro argues, the Government should only be
required to produce evidence of the identity of the parties sufficient to convince a reasonable jury
by a preponderance of the evidence that defendant is the speaker.  *See Tubbs*, 1990 WL 27365, at
*3, *see supra*, fn. 5.  In this way, determining the identity of the speakers could properly be left to
the jury.  *Id.*

In conclusion, this court believes that if, contrary to the practice of most other circuits, the
*Starks* test is to continue being applied as a rigid set of tests, then as concerns the first five
factors, the burden on the Government should continue to be clear and convincing evidence.
However, with respect to the sixth factor, the Government should have to produce evidence
sufficient only to convince a reasonable jury by a preponderance of the evidence that defendant is
the speaker.  Similarly, for the seventh factor, the Government should need to establish consent
of at least one participant to the conversation only by a preponderance of the evidence.

matter asserted." FED. R. EVID. 801©.  A statement is not hearsay if it is

offered against a party and is "the party's own statement." FED. R. EVID.

801(d)(2)(A).  Here, this court finds that the statements of the CW on the tape

recordings are not being introduced to prove the truth of the matter asserted.

They are simply context for Defendant's statements.  Moreover, this court finds

that Defendant's statements on the tape recordings are Defendant own statement

and are offered against Defendant.  Therefore, this court finds that none of the

statements on the tape recordings are barred from admission by the hearsay rule,

as none of them are actually hearsay.

### 3.   The Confrontation Clause

The Confrontation Clause applies to "'witnesses' against the accused-in

other words, those who 'bear testimony'…'testimony,' in turn, is typically '[a]

solemn declaration or affirmation made for the purpose of establishing or proving

some fact.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004).  This court finds

that the CW's statements on the tape recordings are themselves not being used to

establish or prove any fact.  Rather, Defendant's own statements are the real

evidence offered by the tape recordings.  Therefore, this court finds that use of

the tape recordings, which include the CW's statements, does not violate

Defendant's rights under the Confrontation Clause, even though the CW is dead and therefore, unavailable to testify or be cross-examined.

### 4.    Audibility

Finally, Defendant argues that the tape recordings are inadmissible because their low quality of audio recordings renders them untrustworthy. (Def.'s Mem., Document No. 45, at *9.) A trial judge has "considerable discretion regarding the admissibility of a tape recording where there is a serious question of its audibility." *Jackson*, 649 F.2d at 977. Recordings are admissible "unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy." *United States v. DiSalvo*, 34 F.3d 1204, 1220 (3d Cir. 1994). Here, Mrs. DiMatteo testified that ninety percent of the tape recordings was audible. (Tr. 15.) Similarly, Agent Edwards testified that the majority of the tape recordings is audible, and that in the majority of the inaudible sections, only one to two words could not be heard. (Tr. 103.) Therefore, this court finds that the inaudible portions of these tape recordings are insufficient to render the tape recordings untrustworthy or inadmissible.

Hence, this court finds the Government has met its burden, and Defendant's objections to the admission of the tape recordings are unpersuasive. Therefore,

this court will admit the tape recordings into evidence, granting the Government's motion and denying Defendant's.

**B.        Distributing Transcripts of the Tape Recordings to the Jury**

The Government has made clear its intention to move to distribute transcripts of the recordings of the January 18 and January 22, 2007 conversations to the jury.  (*See* Gov't Mot., Document No. 3, ¶ 2.)  Defendant objects on three grounds: (1) the CW never reviewed the transcripts, as they were made three months after he died; (2) the tapes were transcribed nine months after they were made; and (3) Agent Edwards altered the transcripts.

The Third Circuit has permitted the use of transcripts to assist the jury while listening to tape recordings.  *DiSalvo*, 34 F.3d at 1220; *Government of Virgin Islands v. Martinez*, 847 F.2d 128-9 (3d Cir. 1988).  Moreover, it is within the trial judge's discretion to admit transcripts for use with the recordings.  *United States v. Adams*, 759 F.2d 1099, 1115 (3d Cir. 1985).  As these transcripts are not being admitted as evidence in and of themselves, this court will only require that they be accurate representation of the tape recordings.

Therefore, it is immaterial that the CW never reviewed the transcripts and that the tapes were transcribed nine months after they were made, as these facts do

not reflect on the accuracy of the transcripts.  Moreover, Defendant's concerns regarding Agent Edwards's role in the transcribing process can be addressed with instructions to the jury.  *DiSalvo*, 34 F.3d at 1220; *Martinez*, 847 F.2d at 128; *see also* Model Criminal Jury Instructions for the Third Circuit §§ 2.07, 4.06 (Oct. 2007).  This court also notes that in changing the transcripts, Agent Edwards was actually attempting to make the transcripts a more accurate representation of the tape recordings, basing his changes on what he heard, rather than what he remembered.  (Tr. 100-1.)  He also relied on notes which had been made at the same time as the recordings, and confirmed with the CW.  (Tr. 57-8.)  Both Agent Edwards and Mrs. DiMatteo testified that the transcripts accurately reflect the tape recordings.  (Tr. 10, 13, 38, 48)  Thus, this court finds that the transcripts are an accurate representation of the tape recordings.

Hence, when the tape recordings are being played aloud, this court will allow the Government to distribute transcripts of the same to the jury.

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **CRIMINAL ACTION** No. 07-230 |
| **MICHAEL DIMATTEO,** Defendant. | |

## ORDER

**AND NOW**, this 17th day of January, 2008, upon consideration of the "Government's Motion to Admit Tape Recordings" (Document No. 3); the "Reply of Defendant Michael DiMatteo to Government's Motion to Admit Recordings and Transcripts, and Motion to Suppress" (Document No. 20); Defendant's "Memorandum in Support of Defendant DiMatteo's Reply to Government's Motion to Admit Recorded Conversation and Transcripts, and Defendant's Motion to Suppress" (Document No. 45); and the Government's response thereto (Document No. 46), and following a hearing, it is hereby **ORDERED** that the Government's motion is **GRANTED** and Defendant's motion is **DENIED**.

BY THE COURT:

**/s/ Marvin Katz**

_____

**MARVIN KATZ, S.J.**